**COLLIER SOCKS LLP**
Dustin L. Collier (SBN 264766)
V. Joshua Socks (SBN 303443)
Elizabeth R. Malay (SBN 336745)
Drew F. Teti (SBN 267641)
240 Tamal Vista Blvd., Ste. 100
Corte Madera, CA 94925
T:  (415) 767-0047
F:  (415) 767-0037
dcollier@collierlawsf.com
jsocks@collierlawsf.com
emalay@collierlawsf.com
dteti@collierlawsf.com

**ATTORNEYS FOR PLAINTIFF**
LAURIE PAGE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURIE PAGE,<br><br>          Plaintiff,<br><br>vs.<br><br>TOPIX PHARMACEUTICALS, INC. and DOES 1-25, inclusive,<br><br>          Defendants. | Case No.: _____<br>COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL<br><br>(1)  Disability Discrimination<br>      (Cal. Gov't. Code § 12940(a))<br>(2)  Failure to Engage in a Good-Faith Interactive Process<br>      (Cal. Gov't. Code § 12940(n))<br>(3)  Failure to Accommodate<br>      (Cal. Gov't. Code § 12940(m))<br>(4)  Failure to Prevent Discrimination<br>      (Cal. Gov't. Code § 12940(k))<br>(5)  Retaliation<br>      (Cal. Gov't. Code § 12940(h))<br>(6)  Whistleblower Retaliation<br>      (Cal. Labor Code § 1102.5)<br>(7)  Waiting Time Penalties<br>      (Labor Code §§ 201-203, 218) |

1

## NATURE OF THE ACTION

2

   1.     Plaintiff Laurie Page was a beloved sales professional at Defendant TOPIX

3

PHARMACEUTICALS, INC. ("TOPIX") who went from winning Rookie of the Year to being

4

pushed out based on fabricated and pretextual "performance" allegations despite being ranked 5th

5

out of her team of 12. In late March 2023, Plaintiff fell ill, experiencing life-threatening complications

6

following a scheduled surgery. Plaintiff was so concerned with closing her quarter that she worked

7

from her hospital bed to make her sales. Following her illness, Defendant failed to engage in a good-

8

faith interactive process or offer any reasonable accommodations.

9

   2.     Despite this horrific and near-fatal ordeal, Plaintiff missed very little work. She

10

returned to work as soon as she was home from the hospital, and she went back into the field as

11

soon as she could safely walk and drive. With few exceptions, she continued to work almost every

12

day until her unlawful termination on or around September 22, 2023.

13

   3.     On the morning of her termination, Defendant's HR representative pinged Plaintiff

14

and asked her to immediately join a Microsoft Teams meeting. In the meeting, she told Plaintiff she

15

was being terminated for purported "performance" deficiencies. Plaintiff asked the representative on

16

what basis her performance was found to be lacking, and if any of the other members of the team

17

ranked below her were also being let go—HR refused to respond.

18

   4.     Plaintiff alleges disability discrimination causes of action pursuant to the Fair

19

Employment and Housing Act ("FEHA," Govt. Code §12900 et seq.), against Defendant TOPIX

20

and DOES 1-25, inclusive. She also alleges retaliation under the FEHA and the California Labor

21

Code regarding Defendant's unlawful conduct that she suffered after engaging in legally protected

22

conduct. She seeks economic and general damages, punitive damages, equitable and injunctive relief,

23

and reimbursement of reasonable attorneys' fees and costs.

24

25

26

27

28

1

## JURISDICTION AND VENUE

2

     5.      Plaintiff's employment occurred in Contra Costa County, California.

3

     6.      Personal jurisdiction is proper under the California Code of Civil Procedure section

4

410.10 and Federal Rule of Civil Procedure 4(k) because the Defendant has maintained sufficient

5

minimum contacts with the State of California to make the exercise of personal jurisdiction

6

reasonable and just under contemporary standards. TOPIX sells its skincare products in California,

7

employs California-based sales professionals in order to do so, and is registered to do business in

8

California.

9

10

     7.      The amount in controversy exceeds $75,000.

11

     8.      Subject matter jurisdiction in this matter is conferred by 28 U.S.C.A § 1332(a)(1)

12

[diversity jurisdiction].

13

     9.      Jurisdiction of this Court is also invoked pursuant to the FEHA. Specifically,

14

Government Code section 12965(c)(1)(C) provides that after receiving a right to sue letter from the

15

California Civil Rights Department ("CRD"), an aggrieved individual may file a civil lawsuit "against

16

the person, employer, labor organization or employment agency named in the verified complaint

17

within one year from the date of that notice."

18

19

     10.     Plaintiff has fulfilled all the conditions precedent to the institution of this action

20

under Gov. Code sections 12960 and 12965.

21

     11.     Venue in this Court is proper pursuant to 28 U.S.C.A. § 1391 because a substantial

22

part of the events or omissions giving rise the claim(s) occurred in this judicial district.

23

//

24

//

25

//

26

27

28

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>PARTIES</u>**

12.     At all relevant times, Plaintiff was a competent adult and a citizen of California. Plaintiff was an employee of Defendant TOPIX from approximately December 2019 until her unlawful termination on or around September 22, 2023.

13.     Plaintiff is a natural person with a physical disability, perceived disability, or actual and/or perceived potential disability as defined in California Government Code section 12926(m). Moreover, Plaintiff was an "employee" of Defendant within the meaning of Government Code section 12926(c), the applicable Industrial Wage Commission Order(s), and the California Labor Code.

14.     Throughout her employment, Plaintiff made protected disclosures within the meaning of California Labor Code section 1102.5.

15.     Defendant TOPIX is a corporation incorporated under the laws of the State of New York and having its principal place of business in the State of New York. TOPIX advertises itself as the #1 practice-branded skincare provider serving dermatologists and physicians worldwide.

16.     Defendant TOPIX, its various known and unknown business names, and DOES 1-25, inclusive, are herein referred to as "Defendants" interchangeably.

17.     Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as DOES 1-25, inclusive, and therefore sues these Defendants by such fictitious names pursuant to California Code of Civil Procedure section 474. Plaintiff will amend this Complaint to allege the true and correct names and capacities of these DOE Defendants when and if ascertained. Plaintiff is informed and believes, and thereon alleges, that said Defendants, and each of them, are responsible in whole or in part for Plaintiff's damages as alleged herein.

18.     Defendant DOES 1-25 are individuals and entities that, upon information and belief, reside in and/or conducted the material transactions and unlawful acts at issue herein.

19.     Whenever reference is made to any act of Defendants, such allegations shall be deemed to mean that all named Defendants and DOES 1-25, or their officers, agents, managers, representatives, employees, heirs, assignees, customers and tenants, did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants and while acting within the course and scope of their duties.

## AGENCY

20.     Plaintiff is informed and believes, and on that basis, alleges that at all times herein mentioned each of the Defendants was an agent, manager, director, servant, employee, and/or joint-venturer of each of the remaining Defendants, and were at all times acting within the course and scope of such agency, service, employment, and/or joint venture, and each of the Defendants have ratified, approved, and authorized the acts of each of the remaining Defendants with full knowledge of said facts. In the alternative, Plaintiff alleges that Defendants, and each of them, exceeded the course and scope of their agency relationship with one another, rendering the agent(s) liable for their own individualized misconduct.

## AIDING AND ABETTING/CONSPIRACY

21.     Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiff, as alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoing complained of, each of the Defendants acted with an awareness of its/ his/her primary wrongdoing and realized that its/his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing. Defendants, and each of them, also knowingly and willfully conspired to do the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy.

## ALTER EGO/INTEGRATED ENTERPRISE

22.     There is a unity of interest between Defendants, and each acts as the alter ego of the other. Additionally, at all times relevant herein, Defendants were joint employers of the Plaintiff, by virtue of sharing authority over and control of the terms and conditions of Plaintiff's employment.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

23.     Prior to filing this action, on December 6, 2023, Plaintiff filed a charge with the California Civil Rights Division ("CRD"), Matter Number 202312-22872606, alleging the violations of the FEHA as detailed more fully herein.

24.     On December 6, 2023, Plaintiff received a "Right-to-Sue" Notice and Letter from the CRD. This lawsuit is timely initiated within a year of the issuance of the Right to Sue. By obtaining and timely exercising her Right to Sue Notice from the DFEH in a timely manner, Plaintiff has exhausted all available and required administrative remedies.

## FACTUAL ALLEGATIONS

*Despite being hired right before COVID, Plaintiff starts her career at TOPIX by winning Rookie of the Year "with a positive attitude and a smile on her face"*

25.     Plaintiff began working for Defendant TOPIX in December 2019 as a Business Development Specialist, the title given to TOPIX sales representatives. Plaintiff is a highly experienced salesperson who has worked in medical or aesthetic sales since 2012.

26.     TOPIX produces and sells skincare products to medical practices. Those practices can brand the TOPIX products with their own logos and practice names and sell these branded skincare products to their own customers. TOPIX sells its products worldwide.

27.     TOPIX employs approximately 240 people in the United States and 10 in California. They are expected to meet with practices that order TOPIX skincare products in order to provide customer service and training, and to increase the volume, variety, and frequency of the TOPIX

products that these customers order. The sales team are also expected to secure new business for TOPIX so it can increase its sales volume.

28.     Plaintiff was hired shortly before the COVID 19 pandemic shuttered the aesthetic industry. She was furloughed for approximately nine months due to the pandemic and came back with a roar when she returned to full-time status in September 2020.

29.     Plaintiff was so successful in 2021, her first full year at TOPIX, that she grew her territory 43%, opened $69,000 in new business, and finished her year at 104% of quota. These achievements earned Plaintiff the prestigious Rookie of the Year Award. When presenting this award to Plaintiff at the National Sales Meeting in April 2022, the Vice President of Sales Darren Tillman said of Plaintiff, "She did all this with a positive attitude and a smile on her face." Plaintiff finished 2021 ranked 12th of 38 in the President's Club rankings, an annual contest that is awarded to an elite group of sales representatives and leaders, for achieving specific goals—typically attainment of quota.

30.     Plaintiff was initially managed by Maria Poole. Ms. Poole was a hands-on manager, and she met with Plaintiff frequently to brainstorm ideas to grow Plaintiff's business. Ms. Poole often accompanied Plaintiff to meet with accounts, and she provided Plaintiff with both mid-year and year-end performance reviews so that Plaintiff could continue to grow and develop her skills as a sales representative.

31.     In Ms. Poole's 2022 mid-year review of Plaintiff, dated July 11, 2022, she says the following about Plaintiff: "Laurie is consistent in her success. Quarter over quarter she always comes in at goal. I attribute this success to her skill set, knowledge of the line, trust her practices have in her, and creating strategic plans for her accounts to grow. I have rarely seen a BDS that works as hard as Laurie. She is laser focused on getting the job done, and rarely have I ever heard her complain."

32.     Plaintiff finished 2022 ranked 37th of 43 in the President's Club rankings. In her year-end review, Ms. Poole said the following about Plaintiff: "This year has been challenge through the

company [sic]. As I look to your personal track record and accomplishments this year, you consistently perform. Although 76% to goal is certainly not what you were striving for, I know the time, attention and effort you put in to your job is at 100%." Ms. Poole rated Plaintiff a 2.7, where a rating of 3 is "Strong Performer," 2 is "Improvement Needed," and 1 is "Unsatisfactory." Of the 43 sales representatives, only 3 of 43 hit 100% or more of their quota in 2022. And maybe most significant, 20 of the 43 sales representatives came in at 79% or below.

33.     In January or February 2023, TOPIX gave Plaintiff a merit increase.

*Plaintiff was assigned a new manager in 2023 who began retaliating against Plaintiff as soon as she heard that Plaintiff would undergo surgery*

34.     In early 2023, Ms. Poole was promoted. Plaintiff was assigned a new manager, Debbie Sellers, on January 1, 2023.

35.     In February 2023, Sellers traveled to the Bay Area and worked with Plaintiff. The evening before their field ride, Plaintiff had dinner with Sellers and her former manager, Ms. Poole. During that dinner, Plaintiff informed Sellers that she was going to have a planned surgery in early March. Plaintiff expected to be recovering for a week and back in the field shortly after.

36.     Following this conversation, Sellers met with Plaintiff in person only once in the nearly ten-months in which she managed her.

37.     Though Sellers feigned assent to the planned surgery and resulting medical leave, she also immediately began retaliating against Plaintiff following this disclosure. For this field ride together in February, Plaintiff set up meetings with important customers so that Sellers could interact with these key players and serve as another resource for these accounts. Sellers was supposed to work with Plaintiff for the entire day, but Sellers chose to change her flight home to an earlier one, skipping two of the customer meetings in the process. This, in turn, was the only one-on-one

meeting Sellers ever had with Plaintiff in her territory. Following her surgery disclosure and request for accommodation, Sellers isolated and ostracized Plaintiff.

***Plaintiff experienced life-threatening complications following her surgery leading to escalating retaliation by TOPIX***

38.     On March 2, 2023, Plaintiff underwent the planned surgery. After this surgery, her relationship with Sellers became extremely contentious.

39.     Plaintiff's recovery seemed smooth at first. Despite being in pain, Plaintiff was calling customers from bed just one day out from the surgery.

40.     On March 3, Sellers sent an email to her team, congratulating Plaintiff for being ranked 2nd on the team:



41.     But then began a series of intensifying medical issues. On March 8, Sellers checked in on Plaintiff via text, and Plaintiff responded "it's so bad, the most excruciating pain I've ever felt in my life."

42.     On March 13, Plaintiff had difficulty breathing and a fever. She visited her surgeon, who mistakenly told her these complications were unrelated to the surgery.

43.     On March 14, Plaintiff was diagnosed with pneumonia and promptly informed Sellers. At this point, Plaintiff was feeling arthritic, she still had a fever and difficulty breathing, and her resting heart rate was racing at 125 beats per minute.

44.     On March 16, Plaintiff informed Sellers that she was back in urgent care getting stronger antibiotics.

45.     On March 20, Sellers asked Plaintiff if she was back up to full speed and suggested that they speak with HR to discuss additional time off if needed. Plaintiff told Sellers that her doctor had restricted her from returning to the field until she finished her antibiotics, which was a mere six days away. During this time, Plaintiff was still calling accounts to secure orders, attempting to close the quarter at quota despite her worsening medical condition, and attending launch calls and other virtual meetings.

46.     On March 23, Plaintiff went back to her surgeon to have her surgical site irrigated for the second day in a row. The surgical site was infected and required in-office debridement. After the second irrigation, Plaintiff had labs done with her primary care physician. At approximately 11:30 pm that evening, Plaintiff's primary care physician called her, alarmed at her dangerously high white blood cell count. Plaintiff's doctor directed her to immediately go to the emergency room. Plaintiff was admitted to John Muir Hospital and stayed for two nights. By the time she was admitted, Plaintiff was having difficulty speaking, and she could barely stand. She was nearly septic and had a pleural effusion. Doctors removed a liter of fluid from her lungs via a thoracentesis and placed her on intravenous antibiotics.

47.     Also on March 23, Sellers asked Plaintiff for an update of all the sales she expected would ship by the end of the quarter.

48.     When Sellers checked in with Plaintiff again, Plaintiff explained that she was in the hospital. Nevertheless, Plaintiff was so concerned with closing the quarter at quota that she

continued emailing accounts even from her hospital bed. Sellers did not ask Plaintiff if she could assist by reaching out to accounts on Plaintiff's behalf. Sellers did not put Plaintiff in touch with HR to discuss disability or medical leave options. In fact, neither Sellers nor TOPIX engaged Plaintiff in an interactive process of any kind to figure out what sort of assistance Plaintiff may need closing Q1 or being able to physically see customers in the months to come. Neither Defendant offered Plaintiff any accommodations, such as having someone else drive for Plaintiff, a reduced work schedule and quota, or a reduced number of customers. They did not reassign any of Plaintiff's tasks to teammates, or to an inside sales representative, or to a temporary assistant for the few weeks she needed it. Despite her life-threatening illness Plaintiff was offered no assistance of any kind, instead receiving only retaliation for daring to fall ill and seek treatment for it.

49.     Plaintiff had recently opened 5 new accounts. Those new accounts, all Kaiser accounts, were aware of Plaintiff's health condition, as she had kept in contact with them throughout her ordeal. Throughout March, Plaintiff was in touch with Kaiser to plan trainings for the new accounts in April.

50.     On April 1, 2023, Sellers emailed the new Kaiser accounts and said, "Please let me know if there is anything I can do to help support in these next steps." But on April 7, when the new accounts invited Sellers to some of these trainings, Sellers declined the invite and told Kaiser that Plaintiff would be doing all the trainings. Sellers did not ask Plaintiff if she was able to speak long enough to conduct these trainings, or even if she was well enough to walk or drive herself to these locations. Plaintiff was forced to conduct all these new account trainings, despite being weak and unwell.

51.     Because her doctor found that a new pleural effusion forming, Plaintiff had to return for chest x-rays on a weekly basis after she was released from the hospital. Plaintiff was scared and

anxious, and her doctors told her to rest, yet she was expected to be work at the same capacity as any other representative and had not been offered any accommodations, much less reasonable ones.

52.     It took Plaintiff over two months to start feeling close to baseline again, a timeline no doubt elongated by Defendants failure to accommodate. She continued to work as best as she could throughout this time.

53.     Following Plaintiff's sickness, Sellers and TOPIX retaliated against her and iced her out of the company. After Plaintiff fell ill, Sellers avoided working with Plaintiff in person. Sellers also chose not to respond to Plaintiff's accounts when they reached out to her.

54.     After Plaintiff fell ill, Sellers targeted Plaintiff for termination. Sellers interviewed and hired a replacement to ensure they were already in place and ready to take over Plaintiff's territory immediately after her unlawful termination.

55.     Sellers traveled back to the Bay Area in May 2023, but made no effort to meet with Plaintiff or any of her accounts. Sellers again came to the Bay Area to work with some of Plaintiff's teammates in August. Sellers had already approved PTO for Plaintiff on the date she told Plaintiff she could work with her, and Sellers refused to change her schedule to work with Plaintiff on either side of that PTO, even though Sellers would be in the Bay Area. At this point, Plaintiff believed Sellers was actively refusing to work with her or assist her in any way.

56.     When Plaintiff took PTO, she would ask her accounts to contact Sellers for orders or any customer service needs. However, Sellers would not call back Plaintiff's accounts.

### *TOPIX refused to acknowledge the new accounts Plaintiff had opened*

57.     One of the areas of focus that TOPIX gave its sales representatives for 2023 was to open new accounts. Sales representatives were supposed to open 4 new accounts per quarter and were paid extra commission to do so, though this goal was not a part of their sales quotas.

58.     Kaiser Permanente is a major medical provider in Plaintiff's territory. In order to grow her business and open new accounts, Plaintiff opened five new accounts within the Kaiser system in early 2023: Dublin, Antioch, Martinez, Pleasanton, and Walnut Creek. However, Sellers refused to count these new Kaiser accounts as new accounts because they ordered under the main Kaiser account. Sellers told Plaintiff that TOPIX could not trace the orders for these individual locations so these would not count. But this was not true, as Plaintiff could easily track exactly what these new Kaiser accounts ordered. Sellers refused to support Plaintiff and ensure that she received credit for these new locations.

59.     Sellers' refusal to count these new locations as new accounts stands in contrast to Plaintiff's experience in 2022. In Q2 of 2022, she launched TOPIX in five new locations as part of a multi-location account in her territory. Plaintiff's then manager Ms. Poole and the VP of Sales Darren Tillman had no problem counting these new locations as new accounts in Plaintiff's territory.

60.     These new Kaiser accounts were brand new locations that had not previously ordered TOPIX products, and these new accounts took the same amount of work to launch as a new, non-Kaiser account. Additionally, Plaintiff opened two more new accounts in Q3 of 2023, but Sellers refused to advocate for Plaintiff's new Kaiser accounts to count as new accounts, Plaintiff looked like she was ranked poorly in new account openings.

61.     TOPIX also asked the sales representatives to focus on getting Phoenix accounts to place orders in 2023. Phoenix accounts are lapsed accounts that had not ordered TOPIX products in a year. Plaintiff got orders from 3 Phoenix accounts in Q3. Plaintiff believes that Phoenix accounts were being counted as new accounts for at least one representative on Sellers' team.

62.     As of August 29, 2023, a month away from the end of Q3, only 1 of 12 representatives on Sellers's team had opened 12 new accounts year to date. 10 of the 12 had 6 or less new accounts opened year to date. Plaintiff's 5 new Kaiser accounts, 2 non-Kaiser new accounts

(opened in August and September), and 3 Phoenix accounts would have placed her near the top of Sellers' team in this metric.

### *Plaintiff was a strong performer, as confirmed by the Vice President of Sales*

63.     Sellers blind-sided Plaintiff with her vague and baseless "performance" allegations. Objectively, Plaintiff's job performance was plainly above average, in spite of her medical condition and resulting accommodation needs, as demonstrated by the following:

- At the end of Q1 of 2023, Plaintiff was ranked 19 of 39 in year-to-date quota rank;

- At the end of Q2 of 2023, despite being in the throes of recovery from her life-threatening infection and resulting hospitalization, Plaintiff was *still* ranked 23 of 42 overall, and 12th in year-to-date quota rank;

- At the end of Q3 of 2023, Plaintiff was ranked 5th of 12 on Sellers' team, without even being allowed to finish out the quarter.

64.     On August 24, 2023, Vice President of Sales Darren Tillman emailed the entire TOPIX sales team to congratulate 7 sales representatives for having hit their monthly goal early, including Plaintiff. Plaintiff finished August over 105% to quota:



65.     By the end of 2023, when she was not even employed anymore, Plaintiff was ranked 18th of 45 of all TOPIX reps nationwide in total rank, despite being employed for only 8 full months of the year.

66.     At the end of 2023, 6 of 12 reps on Sellers' team were ranked below Plaintiff in total rank, and one of Sellers' reps was ranked second to last. Those reps are still employed by TOPIX at the time of this filing.

**Plaintiff questioned TOPIX's practice of removing accrued sick days at the start of each year, as she believed it violated California law, leading to further retaliation by TOPIX**

67.     When Plaintiff was hired at TOPIX, her former manager Maria Poole emailed the team in December 2020 to tell them to use their accrued time off, or they would lose it. Plaintiff emailed HR to tell them that this policy violated California law. HR never responded to Plaintiff, but Ms. Poole emailed Plaintiff's team a few hours later to say that they could roll 5 days of PTO over to the next year. Given that TOPIX had not been rolling over accrued sick time, and not rolling over PTO, TOPIX had been violating California law.

68.     On February 27, 2023, Plaintiff wrote to TOPIX's HR team, concerned that TOPIX had removed her accrued sick days and reset them to 0 on January 1 each year. Once again, Plaintiff believed that TOPIX was in violation of California law. As such, Plaintiff provided what she believed to be California law governing sick days to the HR team in her email.

69.     On April 20, 2023, Plaintiff spoke on the phone with Vice President of HR Angela Nese to ask why her accrued sick leave had been removed by TOPIX. HR told Plaintiff that because TOPIX provided PTO, TOPIX was allowed to claw back these sick days.

70.     During their call on April 20, 2023, Ms. Nese told Plaintiff that when she was onboarded at TOPIX, Ms. Nese pointed out that TOPIX needed to do a better job with their sick time policy because it was unclear. Ms. Nese said she was familiar with California law, which is why

she reported this issue to TOPIX when she was hired. Plaintiff does not believe TOPIX has made any changes to their sick time policy since Ms. Nese was onboarded in January 2022.

71.     The TOPIX Handbook, which has not been revised since 6/2016, says on page 51, the following about PTO and sick time:

**Accounting for Paid Time Off**

The Company tracks vacation paid time off based upon an employee's hire anniversary date.

Sick / Personal time does not transfer over to the following year.

72.     Given the lack of clarity around TOPIX's policy regarding sick time and PTO, Plaintiff was never clear whether TOPIX was still violating California law.

73.     After Plaintiff made these inquiries, Sellers avoided working with Plaintiff in person. Sellers also chose not to respond to Plaintiff's accounts when they reached out to her and treated Plaintiff less favorably than her other coworkers. After Plaintiff made these inquiries, Sellers targeted Plaintiff for termination, then interviewed and hired a replacement who already in place and ready to take over Plaintiff's territory immediately after Plaintiff was unlawfully fired.

***TOPIX unlawfully terminated Plaintiff shortly before she was about to hit her Q3 quota then failed to timely pay all of her wages***

74.     On the morning of Friday, September 22, 2023, with absolutely no warning, Plaintiff was "pinged" for a Microsoft Teams meeting. Plaintiff joined the video call, with Vice President of Human Resources Angela Nese, Vice President of Sales Darren Tillman, and Sellers already on the line. Ms. Nese informed Plaintiff she was being fired for "performance" reasons, but refused to respond when asked what those reasons were.

75.     When Plaintiff asked about her Q3 commission, Tillman assured her that TOPIX would pay everything she was owed. Plaintiff was told her last day would be the following Monday. In Plaintiff's last payroll statement, it shows that she was only paid through September 23, 2023. However, her last day was actually September 25, 2023.

76.     Additionally, at least one of the wage statements from 2021 provided by TOPIX to the undersigned show that Plaintiff had 80 hours of mandated COVID-19 Supplemental Paid Sick Leave during that pay period. But in the wage statement for that same pay period downloaded contemporaneously by Plaintiff in 2021, the wage statement does not show those 80 hours of mandated sick leave. Failing to provide COVID-19 Supplemental Paid Sick Leave is a violation of California Labor Code section 248.2.

77.     It was not until October 27, 2023 that Plaintiff was paid the commission owed to her, $7,674.22. Even then, Plaintiff was never provided with a statement showing exactly what she was being paid for, and thus she cannot be sure the commission was calculated correctly.

78.     In the personnel records provided by TOPIX, Sellers confessed that she had already found Plaintiff's replacement as of August 29, 2023. No matter how well Plaintiff performed, Sellers was going to terminate her because of her disability and whistleblowing activity. In her email to Ms. Nese in HR, Sellers write, "Although Laurie is adept at training and supporting her accounts, her ability to effectively open new business is a detriment to the territory she manages as well as the region as a whole. Darren and I have agreed that we want to move forward with replacing her with another candidate whom we already have vetted and is ready to accept an offer to move forward in this role." Sellers deliberately omitted any mention of the new Kaiser accounts or revived Phoenix accounts. In response, Ms. Nese questioned why Plaintiff was being held to a different standard than another representative on Sellers' team, who had had opened only 1 new account so far that year. But HR eventually signed off on the termination despite this retaliatory double standard.

**FIRST CAUSE OF ACTION:**
**Disability Discrimination**
**(Cal. Gov't. Code § 12940(a))**

79.     Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein, excepting those allegations that are inconsistent with this cause of action.

80.     FEHA, at Government Code section 12940(a), makes it unlawful for an employer, because of the physical or mental disability (hereinafter jointly referred to as "health condition" or "health conditions") of any person, to bar or discharge the person from employment or discriminate against the person in compensation, terms, conditions, or privileges of employment.

81.     At all applicable times mentioned in this Complaint, Defendant was an employer within the meaning and provisions relating to employers under FEHA. (Gov. Code § 12926(d).)

82.     FEHA further defines "health condition" as including a record or history of a disorder, condition, or impairment which is known to the employer or other entity covered by FEHA, and also includes being "regarded or treated by the employer" as having an impairment or condition that makes or will make achievement of a major life activity difficult, including physical, mental, social, and working activities. (Gov. Code § 12926(j), (m).)

83.     California law, as expressly set forth in its constitutional and statutory provisions, prohibits employment discrimination because an employee suffers from a health condition, has a record of a health condition, or is perceived as suffering from a health condition.

84.     Upon information and belief at all times relevant, Plaintiff suffered from one or more health conditions or perceived health conditions, as defined by the FEHA at 12926(m). Those health conditions and/or diagnoses include, but are not limited to, continuing long-term recovery from a massive surgical infection, pneumonia, and pleural effusion.

85.     Plaintiff is a natural person with a health condition, and/or perceived health condition, or actual or perceived potential health condition as defined in California Government

Code section 12926(j), (m). Upon information and belief, Plaintiff's health condition affected her neurological and musculoskeletal systems, and/or other systems. Further, the conditions limited Plaintiff's physical, mental, and social life activities as well as the major life activity of working. This entitles Plaintiff to protection under the FEHA.

86.     Defendant knew or reasonably should have known of Plaintiff's actual health condition and/or knew that she had a record of health conditions, as defined by the FEHA. Alternatively, Defendant regarded or perceived Plaintiff as having or having had a health condition that currently has no disabling effect but may become an impairment in the future that limits Plaintiff's ability to participate in major life activities.

87.     At all times relevant, Plaintiff was qualified for and could perform the essential functions of her position with Defendant, with or without reasonable accommodation. At all times relevant to this action, Plaintiff performed her job at least satisfactorily from her date of hire until her unlawful termination.

88.     Plaintiff's health condition was a substantial motivating factor underlying Defendant's adverse employment actions, including but not limited to:

- Failing to provide Plaintiff with reasonable accommodations: at any time following her post-surgical complications, or following Plaintiff's hospitalization for infection and pleural effusion;

- Failing to engage in a timely and good faith discussion and interactive process; and

- Terminating Plaintiff's employment.

89.     The above acts and omissions of Defendant, and each of them, constitute discrimination based on Plaintiff's health conditions, perceived health conditions, or actual or perceived potential health conditions and accordingly violates Government Code section 12940(a) and other provisions of the FEHA.

90.     Defendant's conduct violates FEHA, and as a direct, foreseeable, and proximate result of Defendants' willful, knowing, and intentional violation(s) of FEHA and have caused Plaintiff to suffer, and to continue to suffer, injury, including lost wages and benefits, attorneys' fees, costs of suit and other pecuniary loss not presently ascertained, the exact amount of which will be proven at the trial.

91.     As a further direct, foreseeable, and proximate legal result of the acts and conduct of Defendants, and each of them, Plaintiff has been caused to and did suffer, and continues to suffer pain, mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress.  Plaintiff is entitled to a recovery for said human losses in an amount according to proof at trial.

92.     Plaintiff is informed and believes, and thereon alleges, that Defendants, and each of them, by engaging in the aforementioned acts and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, fraudulent, intentional, oppressive, and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Plaintiff. Defendants, through their officers, agents, supervisors and/or their employees ratified, authorized and/or condoned the unlawful behavior. Defendants knew that the adverse actions taken against Plaintiff, such as her termination, would cause great financial and emotional harm to Plaintiff. By reason thereof, Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at trial.

93.     By reason of the conduct of Defendants, and each of them, Plaintiff has necessarily retained counsel to prosecute the within action. Plaintiff is therefore entitled to reasonable attorneys' fees and costs of suit as provided in, without limitation, Section 12956(b) of the California Government Code. Additionally, pursuant to Section 12965 of the California Government Code, as a result of Defendant's discrimination, Plaintiff is entitled to recover damages for economic and

physical harm, emotional distress, attorneys' fees, costs, and expert witness fees in amounts according to proof at trial.

**SECOND CAUSE OF ACTION:**
**Failure to Engage in a Good-Faith Interactive Process**
**(Cal. Gov't. Code § 12940(n))**

94.     Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein, excepting those allegations that are inconsistent with this cause of action.

95.     FEHA, at Gov. Code sections 12940(n) and 12926.1(e), requires an employer to engage in a meaningful, good faith, and timely interactive process with its disabled employee to determine a reasonable accommodation with respect to the job, and with respect to the time and manner in which their job functions are to be performed.

96.     Upon information and belief, at all times relevant, Plaintiff suffered from one or more health conditions or perceived health conditions, physical disability, as defined by the FEHA at Section 12926(m). Those health conditions and/or diagnoses include, but are not limited to, continuing long-term recovery from a massive surgical infection, pneumonia, and pleural effusion.

97.     Plaintiff is a natural person with a health condition, and/or perceived health condition, or actual or perceived potential health condition as defined in California Government Code section 12926(j), (m). Upon information and belief, Plaintiff's health conditions affected Plaintiff's musculoskeletal and other bodily systems. Further, the aforementioned conditions limited Plaintiff's physical, mental, and social activities and working. This entitles Plaintiff to protection under the FEHA.

98.     Once Defendant became aware of Plaintiff's actual or perceived need for accommodation, Defendant's obligation to engage in a good faith interactive process with Plaintiff was triggered, requiring Defendant to determine Plaintiff's entitlement to and the availability of reasonable accommodations. That obligation and duty continued as Plaintiff's needs for further

accommodations arose, as her health condition may have changed, and as the perceived hardship or reasonableness of Plaintiff's accommodations changed over time.

99.     Alternatively, Defendant regarded or perceived Plaintiff as having or having had conditions that currently have no disabling effect but may become an impairment in the future that limits Plaintiff's ability to participate in major life activities.

100.     Plaintiff is informed and believes, and thereon alleges, that Defendant, and each of them, were aware of Plaintiff's health conditions, perceived health conditions, and/or perceived or actual potential health conditions. Accordingly, Defendant had an affirmative duty pursuant to California Government Code section 12940(m) to accommodate Plaintiff. Defendant failed to engage in a good-faith interactive process with Plaintiff as required by California Government Code section 12940(n) to determine a reasonable accommodation.

101.     Plaintiff performed her job successfully, despite her disabilities. Rather than engaging in any meaningful interactive process, Defendant held Plaintiff to different standards than other representatives in the sales force and terminated her despite her sales ranking in the top third of the company. Plaintiff's manager refused to work with Plaintiff after she fell ill, refused to count hard-fought new Kaiser accounts as new accounts, ignored Plaintiff's accounts when they reached out to her, and provided bogus and pretextual explanations to HR as the justification to terminate Plaintiff. Then, Defendants unlawfully terminated Plaintiff. In doing so, TOPIX failed in their duty to interact with Plaintiff in good faith to reasonably accommodate Plaintiff's health condition, even though her health condition could have been readily accommodated by educating Plaintiff about disability options, providing Plaintiff with a driver when she was able to get into the field, distributing some of Plaintiff's job duties to other employees, and otherwise letting Plaintiff work on a reduced schedule so she could heal and recover from the significant trauma that she had suffered.

102.    At all times relevant, Plaintiff was qualified for and could perform the essential functions of her position with Defendant, with or without reasonable accommodation.

103.    Plaintiff's disabilities were a substantial motivating factor underlying Defendant's adverse employment actions, including but not limited to: failing to engage in an interactive process; failing to accommodate her health conditions; and terminating her employment.

104.    The above acts and omissions of Defendant constitutes discrimination based on Plaintiff's health conditions, perceived health conditions, or actual or perceived potential health conditions and accordingly violates Government Code section 12940(n) and other provisions of the FEHA.

105.    Defendant's actions and conduct violates FEHA, and as a direct, foreseeable, and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, injury, including lost wages and benefits, attorneys' fees, costs of suit and other pecuniary loss not presently ascertained, the exact amount of which will be proved at the trial.

106.    As a further direct, foreseeable, and proximate legal result of the acts and conduct of Defendant, Plaintiff has been caused to and did suffer, and continues to suffer pain, mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress. Plaintiff is entitled to a recovery for said human losses in an amount according to proof at trial.

107.    Plaintiff is informed and believes, and thereon alleges, that Defendant, by engaging in the aforementioned acts and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, fraudulent, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Plaintiff. Defendants, through their officers, agents, supervisors and/or their employees ratified, authorized and/or condoned the unlawful behavior. Defendant knew that Plaintiff's termination would cause great financial and emotional

harm to Plaintiff. By reason thereof, Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at trial.

108.    By reason of the conduct of Defendant, Plaintiff has necessarily retained counsel to prosecute the within action. Plaintiff is therefore entitled to reasonable attorneys' fees and costs of suit as provided in, without limitation, Section 12956(b) of the California Government Code. Additionally, pursuant to Section 12965 of the California Government Code, as a result of Defendant's discrimination, Plaintiff is entitled to recover damages for economic and physical harm, emotional distress, attorneys' fees, costs, and expert witness fees in amounts according to proof at trial.

## THIRD CAUSE OF ACTION:
### Failure to Accommodate
### (Cal. Gov't. Code § 12940(m))

109.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein, excepting those allegations that are inconsistent with this cause of action.

110.    It is unlawful for an employer to fail to provide a reasonable accommodation to an employee with a known health condition if accommodation does not cause the employer undue hardship. (Cal. Govt. Code § 12940(m).) Defendant violated the FEHA by, among other things, failing to provide a reasonable accommodation for Plaintiff's health conditions, perceived health conditions, or actual or perceived potential health conditions. Plaintiff performed her job successfully, despite her health conditions, without any hardship (much less an "undue" hardship within the meaning of FEHA).

111.    Defendant knew of Plaintiff's actual and/or perceived health conditions, and yet Defendant failed and refused to make reasonable accommodation for Plaintiff's known health conditions, resulting in Plaintiff's forced and unlawful termination.

112.     Upon information and belief, at all times relevant, Plaintiff suffered from one or more health conditions or perceived health conditions, here, physical and mental disabilities, as defined by the FEHA at Section 12926(m). Those health conditions and/or diagnoses include, but are not limited to, continuing long-term recovery from a massive surgical infection, pneumonia, and pleural effusion.

113.     Plaintiff is a natural person with health conditions, and/or perceived health conditions, or actual or perceived potential health condition as defined in California Government Code section 12926(j),(m). Upon information and belief, Plaintiff's health conditions affected Plaintiff's neurological, musculoskeletal, and other bodily systems. Further, the conditions limited Plaintiff's physical, mental, and social activities and working. This entitles Plaintiff to protection under the FEHA.

114.     Defendant perceived that Plaintiff suffered from a health condition as defined by the FEHA. Alternatively, Defendant regarded or perceived Plaintiff as having or having had a condition that currently has no disabling effect but may become an impairment in the future that limits Plaintiff's ability to participate in major life activities.

115.     It is unlawful for an employer to fail to provide a reasonable accommodation to an employee with a known health condition if that accommodation does not cause the employer undue hardship. (Cal. Govt. Code § 12940(m).) Defendants, and each of them, violated the FEHA by, among other things, failing to provide any reasonable accommodations for Plaintiff's physical or mental health conditions, perceived health conditions, or actual or perceived potential health conditions. Nevertheless, Plaintiff performed her job successfully and her termination was not justifiable.

116.     On information and belief, had Defendant engaged in a good-faith interactive process with Plaintiff and determined what reasonable accommodations were needed for Plaintiff to continue

to perform the essential functions of her job, the following reasonable accommodations would have included, but would not have been limited, to:

- Permitting Plaintiff to take a leave of absence so that she could fully recuperate from her life-threatening infection and resulting medical conditions;

- Delegating and assigning work tasks, such as conducting trainings or cold calling accounts, among other employees, in the event a job or task was too physically demanding for Plaintiff to perform;

- Ensuring Plaintiff would have support, such as a driver, so she could work in the field, even while taking pain medication if needed;

- Placing Plaintiff in a different role so as to allow for other accommodations;

- Providing appropriate breaks, counseling, and other support services necessary to cope with the stress of recovering from such a terrifying ordeal;

117.    Providing managerial support instead of managerial retaliation, in order to support Plaintiff and her accounts as she recovered.

118.    Plaintiff will identify other reasonable accommodations that would have been available to Plaintiff up to and including the time of trial.

119.    On information and belief, if Defendant engaged in a good-faith interactive process with Plaintiff and still determined that no reasonable accommodations were available for Plaintiff's current position, a reassignment accommodation would have readily been available to a qualified individual such as Plaintiff.

120.    At all times relevant, Plaintiff was qualified for and could perform the essential functions of her position with Defendant, with or without reasonable accommodation.

121.    Defendant's failure to provide reasonable accommodation for Plaintiff's known health condition was in violation of FEHA, Government Code section 12940(m).

122.    Plaintiff's disabilities were a substantial motivating factor underlying Defendant's adverse employment actions, including but not limited to failing to engage in an interactive process, failing to accommodate her health condition, and terminating Plaintiff.

123.    The above acts and omissions of Defendants, and each of them, constitute discrimination based on Plaintiff's health conditions, perceived health conditions, or actual or perceived potential health conditions and accordingly violates Government Code section 12940(m) and other provisions of the FEHA.

124.    Defendant's conduct violates FEHA, and as a direct, foreseeable, and proximate result of Defendant's conduct, including its willful, knowing, and intentional violation(s) of FEHA, has caused Plaintiff to suffer, and to continue to suffer, injury, including lost wages and benefits, attorneys' fees, costs of suit and other pecuniary loss not presently ascertained, the exact amount of which will be proved at the trial.

125.    As a further direct, foreseeable, and proximate legal result of the acts and conduct of Defendant, Plaintiff has been caused to and did suffer, and continues to suffer pain, mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress.  Plaintiff is entitled to a recovery for said human losses in an amount according to proof at trial.

126.    Plaintiff is informed and believes, and thereon alleges, that Defendant, by engaging in the aforementioned acts and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, fraudulent, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Plaintiff. Defendant, through their officers, agents, supervisors and/or their employees ratified, authorized and/or condoned the unlawful behavior. Defendant knew that Plaintiff's termination would cause great financial and emotional harm to Plaintiff, as did the ongoing failure to reasonably accommodate Plaintiff or engage in any good faith interactive process so that her workload and attendant stress would be reduced. By reason

thereof, Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at trial.

127.    By reason of the conduct of Defendant, Plaintiff has necessarily retained counsel to prosecute the within action. Plaintiff is therefore entitled to reasonable attorneys' fees and costs of suit as provided in, without limitation, Section 12956(b) of the California Government Code. Additionally, pursuant to Section 12965 of the California Government Code, because of Defendant's discrimination, Plaintiff is entitled to recover damages for economic and physical harm, emotional distress, attorneys' fees, costs, and expert witness fees in amounts according to proof at trial.

### FOURTH CAUSE OF ACTION:
**Failure to Prevent Discrimination**
**(Cal. Gov't. Code § 12940(k))**

128.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein, excepting those allegations that are inconsistent with this cause of action.

129.    Employers have an affirmative duty to take reasonable steps to prevent and promptly correct discriminatory, retaliatory, and harassing conduct. (Gov. Code, § 12940(k).)

130.    Further, employers have an affirmative duty to create a workplace environment that is free from employment practices prohibited by the FEHA. In addition to distributing the Department's DFEH-185 brochure on sexual harassment, or an alternative writing that complies with Government Code section 12950, an employer must develop a harassment, discrimination, and retaliation prevention policy that:

- Is in writing;

- Lists all current protected categories covered under the FEHA;

- Indicates that the law prohibits coworkers and third parties, as well as supervisors and managers with whom the employee comes into contact, from engaging in conduct prohibited by the FEHA;

- Creates a complaint process to ensure that complaints receive:

  i.    an employer's designation of confidentiality, to the extent possible;

  ii.   a timely response;

  iii.  impartial and timely investigations by qualified personnel;

  iv.   documentation and tracking for reasonable progress;

  v.    appropriate options for remedial actions and resolutions; and

  vi.   timely closures.

- Provides a complaint mechanism that does not require an employee to complain directly to his or her immediate supervisor, including, but not limited to, the following:

  i.    direct communication, either orally or in writing, with a designated company representative, such as a human resources manager, EEO officer, or other supervisor; and/or

  ii.   a complaint hotline; and/or

  iii.  access to an ombudsperson; and/or

  iv.   identification of the Department and the U.S. Equal Employment Opportunity Commission (EEOC) as additional avenues for employees to lodge complaints.

- Instructs supervisors to report any complaints of misconduct to a designated company representative, such as a human resources manager, so the company can try to resolve the claim internally;

- Indicates that when an employer receives allegations of misconduct, it will conduct a fair, timely, and thorough investigation that provides all parties appropriate due process and reaches reasonable conclusions based on the evidence collected;

- States that confidentiality will be kept by the employer to the extent possible, but not indicate that the investigation will be completely confidential;

- Indicates that if at the end of the investigation misconduct is found, appropriate remedial measures shall be taken; and

- Makes clear that employees shall not be exposed to retaliation as a result of lodging a complaint or participating in any workplace investigation.

131.    Dissemination of the policy must include one or more of the following methods:

- Printing and providing a copy to all employees with an acknowledgment form for the employee to sign and return;

- Sending the policy via e-mail with an acknowledgment return form;

- Posting current versions of the policies on a company intranet with a tracking system ensuring all employees have read and acknowledged receipt of the policies;

- Discussing policies upon hire and/or during a new hire orientation session; and/or

- Any other way that ensures employees receive and understand the policies.

132.    Any employer whose workforce at any facility or establishment contains 10 percent or more of persons who speak a language other than English as their spoken language shall translate the retaliation/discrimination policy into every language that is spoken by at least 10 percent of the workforce.

133.    Defendant knew or should have known of the discrimination occurring based on Plaintiff's health conditions, perceived health conditions, or perceived or actual potential health condition.

134.    In engaging in the conduct described above, Defendant failed to engage in any reasonable steps to prevent disability discrimination from occurring in the workplace. Defendant

failed to provide Plaintiff a reasonable accommodation and failed to engage in the interactive process. This ultimately resulted in Plaintiff's unlawful termination. Moreover, Plaintiff is informed and believes, and thereupon alleges, that Defendant failed to comply with the requirements set forth in ¶¶ 129-132, above.

135.    These failures by Defendant constituted unlawful employment discrimination, and the failure to prevent that discrimination was a substantial factor in causing damage and injury to Plaintiff.

136.    As a foreseeable, direct and proximate result of Defendant's acts and omissions caused Plaintiff to suffer, and to continue to suffer, injury, including lost wages and benefits, attorneys' fees, costs of suit and other pecuniary loss not presently ascertained, the exact amount of which will be proved at the trial.

137.    As a further foreseeable, direct, and proximate legal result of the acts and conduct of Defendant, Plaintiff has been caused to and did suffer, and continues to suffer pain, mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress. Plaintiff is entitled to a recovery for said human losses in an amount according to proof at trial.

138.    Plaintiff is informed and believes, and thereon alleges, that Defendant, by engaging in the aforementioned acts and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, fraudulent, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Plaintiff. Defendant, through their officers, agents, supervisors and/or their employees ratified, authorized and/or condoned the unlawful behavior. Defendant knew that Plaintiff's termination would cause great financial and emotional harm to Plaintiff, as did the ongoing failure to reasonably accommodate Plaintiff or engage in any good faith interactive process so that her workload and attendant stress would be reduced. By reason

thereof, Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at trial.

139.    By reason of the conduct of Defendants, and each of them, Plaintiff has necessarily retained counsel to prosecute the within action. Plaintiff is therefore entitled to reasonable attorneys' fees and costs of suit as provided in, without limitation, Section 12956(b) of the California Government Code. Additionally, pursuant to Section 12965 of the California Government Code, as a result of Defendant's discrimination, Plaintiff is entitled to recover damages for economic and physical harm, emotional distress, attorneys' fees, costs, and expert witness fees in amounts according to proof.

**FIFTH CAUSE OF ACTION:**
**Retaliation**
**(Gov't. Code § 12940(h))**

140.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein, excepting those allegations that are inconsistent with this cause of action.

141.    California law prohibits employers subject to FEHA from retaliating against an employee for exercising their protected rights, engaging in protected activities under FEHA, or opposing practices forbidden by the FEHA. (Cal. Gov. Code § 12940(h).)

142.    Plaintiff exercised her rights and engaged in activities protected by FEHA, including (without limitation) taking time off and working from home following her life-threatening illness caused by surgical complications.

143.    Defendants responded to Plaintiff's protected acts by (among other acts and conduct) failing to appropriately alleviate Plaintiff from some of her work duties such that Plaintiff had to work from the hospital and at home while she should have been recovering, failing to hire or otherwise offer additional support to Plaintiff so that her working hours could be reduced, failing to engage in a good faith interactive process or otherwise offer any reasonable accommodation that

would have permitted Plaintiff to recover, and ultimately terminating Plaintiff's employment. In doing so, Defendant placed Plaintiff's health and safety in great jeopardy.

144.    Plaintiff's participation in activities protected by FEHA was, at least in motivating part, a substantial factor in Defendant's adverse employment acts against Plaintiff.

145.    By and through the aforesaid acts and omissions of Defendant, and each of them, Plaintiff has been directly and legally caused to suffer actual damages including, but not limited to, loss of earnings and future earning capacity, loss of benefits, attorneys' fees, costs of suit, and other pecuniary loss not presently ascertained. Accordingly, Plaintiff is entitled to a recovery for said damages in an amount according to proof at trial.

146.    As a further direct and legal result of the acts and conduct of Defendants, and each of them, as aforesaid, Plaintiff has been caused to and did suffer, and continues to suffer significant emotional and mental distress, anguish, humiliation, embarrassment, fright, shock, pain, discomfort, and anxiety. Therefore, Plaintiff is entitled to a recovery for said damages in an amount according to proof at trial.

147.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees to which she is entitled under FEHA. Plaintiff is presently unaware of the precise amount of these expenses and fees and prays leave of court to amend this Complaint when the amounts are more fully known.

148.    Defendant's conduct was a substantial factor in causing Plaintiff's harm.

### SIXTH CAUSE OF ACTION:
**Whistleblower Retaliation**
**(Cal. Lab. Code § 1102.5)**

149.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein, excepting those allegations that are inconsistent with this cause of action.

150.     California Labor Code section 1102.5(a) prohibits an employer, or any person acting on behalf of the employer, from adopting or enforcing any rule, regulation, or policy that prevents an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

151.     California Labor Code § 1102.5(b) prohibits an employer, or any person acting on behalf of the employer, from discharging, retaliating or in any manner discriminating against any employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

152.     California Labor Code § 1102.5(c) prohibits an employer from retaliating against an employee for refusing to participate in an activity that would result in a violation of state or federal state, or a violation of or noncompliance with a state or federal rule or regulation.

153.     Plaintiff reported to Defendant what she reasonably believed to be violations of state law. Plaintiff's protected activities are detailed in ¶¶ 68-74 above.

154.     At the time Plaintiff raised her concerns about the violations of state law, Plaintiff reasonably believed laws had or were being broken. Those laws include but are not limited to California Labor Code § 246.

155.     The protected disclosures were made to persons that had authority over Plaintiff and had the authority to make and enforce rules, regulations and policies affecting employees and the terms and conditions of their employment, and to investigate, discover or correct the violations or noncompliance reported by Plaintiff. Plaintiff also disclosed to employees who had the authority to investigate, discover, or correct the violation or noncompliance.

156.     Plaintiff suffered adverse action when Defendants, by and through their agents and employees, which, individually or taken as a whole, materially and adversely affected the terms, conditions and privileges of employment for Plaintiff, including but not limited to the following:

- Failing to provide Plaintiff with reasonable accommodations;
- Failing to engage in a timely and good faith discussion and interactive process;
- Terminating Plaintiff's employment.

157.     As a direct and proximate result of Defendant's actions, Plaintiff suffered and will continue to suffer human harms and losses, including pain, mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress.

158.     Plaintiff has further suffered and will continue to suffer a loss of earnings and other employment benefits, whereby Plaintiff is entitled to compensatory damages in amounts to be proven at trial.

159.     Defendant's conduct was a substantial factor in causing Plaintiff's harm.

160.     Defendant committed the acts and conduct alleged herein by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled

to recover nominal, actual, compensatory, punitive, and exemplary damages in amounts according to proof at time of trial, in addition to any other remedies and damages allowable by law. Defendant, through its officers, managing agents, employees and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct alleged herein. By reason thereof, Plaintiff is entitled to an award of punitive damages in an amount according to proof at the time of trial.

161.     Plaintiff has incurred and continues to incur legal expenses and attorneys' fees to which she is entitled under Labor Code section 1102.5. Plaintiff is presently unaware of the precise amount of these expenses and fees and prays leave of court to amend this Complaint when the amounts are more fully known.

**SEVENTH CAUSE OF ACTION:**
**Waiting Time Penalties**
**(Cal. Labor Code §§ 201, 203, 218)**

162.     Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein, excepting those allegations that are inconsistent with this cause of action.

163.     Labor Code section 201(a) requires that all compensation is due immediately upon the termination of an employee, including commissions. Labor Code section 203 provides that if an employer willfully fails to pay compensation promptly upon termination, then the employer is liable for waiting time penalties in the form of continued compensation for up to thirty workdays. Labor Code section 218 provides for an award of attorney's fees in an action for non-payment of wages.

164.     Defendant has willfully failed and refused to timely pay compensation and wages to Plaintiff who has been separated from employment, as required by Labor Code sections 201.

165.     As alleged above, Plaintiff was entitled to be paid commissions earned on her last day of employment on September 25, 2023, but was unlawfully denied these commissions until October 27, 2023.

166.    Plaintiff's last day of employment was September 25, 2023, but according to her final paystub, Plaintiff was paid wages only through September 23, 2023.

167.    Because of Defendant's willful conduct in not paying Plaintiff timely and complete compensation, Plaintiff is entitled to up to 30 days' wages as a penalty under Labor Code section 203, together with interest thereon and attorney's fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for Judgment against Defendant as follows:

1.  For compensatory damages, including expenses owed, underpaid wages, back pay, and general and non-economic damages in an amount according to proof but presently estimated to be in excess of ten million dollars;

2.  For punitive damages in an amount to be determined by the fact finder;

3.  For costs and reasonable attorneys' fees, including a contingency fee enhancement beyond the lodestar;

4.  For injunctive relief requiring Defendant to adopt policies and practices to ensure that employees are afforded their rights under the FEHA such as reasonable accommodations in the workplace, that Defendant engage in a meaningful interactive process to accommodate disabled employees, and further requiring all liable parties to undergo training on engaging in the interactive process, accommodating disabilities, prevention of discrimination or retaliation, and that employees are afforded their rights under Labor Code section 1102.5 to report suspected unlawful activity without reprisal, and any other form of training or injunctive relief that the Court deems appropriate;

5.  For declaratory relief, as may be appropriate under the law and circumstances;

6.  For an award of interest, including prejudgment interest, at the legal rate;

7.  For such other, further, and equitable relief, including potential front pay for a reasonable period in lieu of reinstatement, as the Court deems just and proper under the circumstances; and

8.  For such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on every cause of action for which she has a right thereto.

February 12, 2024

Respectfully submitted,

Dustin L. Collier
V. Joshua Socks
Elizabeth R. Malay
Drew F. Teti
**ATTORNEYS FOR PLAINTIFF**
Laurie Page